IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH

| | |
|---|---|
| ADVANCED COMFORT TECHNOLOGIES, INC., d/b/a INTELLIBED, a Utah corporation,<br><br>*Plaintiff*,<br><br>v.<br><br>LONDON LUXURY, LLC, a New York limited liability company,<br><br>*Defendant*. | **MEMORANDUM DECISION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION TO DISMISS**<br><br><br>Case No. 2:17-cv-00497-JNP<br><br>District Judge Jill N. Parrish |

Before the Court is Defendant's Motion to Dismiss Plaintiff's Complaint (ECF No. 14). For the reasons set forth below, the motion is GRANTED IN PART and DENIED IN PART.

## I.        INTRODUCTION

This is a contract case. Plaintiff Advanced Comfort Technologies, Inc. d/b/a/ intelliBED ("Intellibed") entered into a Non-Circumvention Agreement (the "Agreement") with Defendant London Luxury, LLC. Under the Agreement, London Luxury agreed to use "best efforts" to market Intellibed mattresses to Mattress Firm, Inc., a third-party retailer. In exchange, Intellibed agreed to pay London Luxury a finder's fee. About two months after signing, the deal soured. Intellibed claims that London Luxury misrepresented its relationship with Mattress Firm, among other things. Intellibed also claims that London Luxury did not use "best efforts" to market Intellibed mattresses to Mattress Firm. Intellibed now wants out of the Agreement. So it brought the following causes of action against London Luxury: (1) fraud/fraud in the inducement, (2)

breach of contract, (3) breach of the implied covenant of good faith and fair dealing, and (4) breach of fiduciary duty. London Luxury has moved to dismiss Intellibed's complaint.

## II.    FACTUAL ALLEGATIONS

Intellibed is the inventor and manufacturer of a gel mattress called Gel Matrix. Compl. ¶ 6. London Luxury is a manufacturer and distributor of home products with a sourcing arm that markets third-party products, including mattresses, to retailers. Compl. ¶ 7.

Prior to February 2017, Intellibed was searching for a marketing partner that could introduce the Gel Matrix mattress to Mattress Firm, a third-party retailer. Compl. ¶ 10. Intellibed was introduced to London Luxury. Compl. ¶ 10. During initial discussions, Intellibed told London Luxury about its desire to market the Gel Matrix mattress to Mattress Firm. Compl. ¶ 11. London Luxury's president, Steve Schwartz, expressed a desire to work with Intellibed in an exclusive relationship. Compl. ¶ 11. Mr. Schwartz told Intellibed that London Luxury had a longstanding relationship with Mattress Firm. Compl. ¶ 11. And he told Intellibed that he thought that London Luxury could get the Gel Matrix mattress into Mattress Firm showrooms. Compl. ¶ 11.

Based on these discussions, the parties met on February 13, 2017. Compl. ¶ 12. Intellibed representatives traveled to London Luxury headquarters and spoke with representatives from London Luxury. Compl. ¶ 13. Intellibed stated that it needed a partner that (a) would have significant influence with Mattress Firm, particularly with its buyers and those who would control product distribution, (b) had a significant and longstanding business relationship with Mattress Firm such that it would have both the connections and the know-how to get Intellibed's products placed, and (c) would give Intellibed the best possible chance to successfully place its mattresses with Mattress Firm. Compl. ¶ 13.

To vet London Luxury's qualifications, Intellibed asked detailed questions. Compl. ¶ 14. Intellibed asked about (a) the magnitude of London Luxury's annual revenues, (b) the magnitude of London Luxury's business with Mattress Firm, and (c) London Luxury's relationship with Mattress Firm and its influence and connection with Mattress Firm. Compl. ¶ 14.

In response, London Luxury's CEO Marc Jason and its president Mr. Schwartz represented that:

a) London Luxury's annual revenues were in the high nine figures, not quite a billion;

b) Approximately one quarter of London Luxury's annual revenues stemmed from work with Mattress Firm;

c) London Luxury was the largest single accessory provider to Mattress Firm, shipping products to thousands of Mattress Firm locations every week; and

d) London Luxury was a major influencer with Mattress Firm, and it had the best relationships of any potential partner with the highest and most senior people and key decision-makers at Mattress Firm.

Compl. ¶ 15.

Mr. Jason and Mr. Schwartz also told Intellibed that London Luxury had a longstanding relationship with Columbia Sportswear Company and that London Luxury had success in selling Columbia-branded pillows to Mattress Firm. Compl. ¶ 16. London Luxury suggested that it could use the Gel Matrix mattress to offer a Columbia-branded mattress. Compl. ¶ 16. London Luxury claimed that it could "immediately incorporate" the Gel Matrix mattress into a line of Columbia-branded products that would be marketed to Mattress Firm. Compl. ¶ 16.

At the February 13 meeting, Mr. Jason told Intellibed that it needed to quickly sign a contract because London Luxury was meeting with Mattress Firm's CEO on February 20. Compl. ¶ 17. He told Intellibed that it needed to sign a contract before the meeting if London Luxury was going to present the Gel Matrix mattress to Mattress Firm. Compl. ¶ 17. According to Intellibed, there was never any meeting scheduled. Compl. ¶ 19. London Luxury allegedly lied about the meeting to get Intellibed to sign a contract. Compl. ¶ 19.

On February 21, the day after the purported meeting, London Luxury and Intellibed executed a Non-Circumvention Agreement (the "Agreement").[1] Compl. ¶ 20. The parties had allegedly agreed to the terms of the Agreement before the "meeting." Compl. ¶ 20. Under the Agreement, London Luxury agreed to use its "best efforts" to market Intellibed gel mattresses to Mattress Firm. ECF No. 14-2 at 2. London Luxury also agreed not to "market any other 'gel matrix' mattress product to [Mattress Firm]." ECF No. 14-2 at 2. The Agreement does not prohibit London Luxury from marketing any other class of goods. *See* ECF No. 14-2 at 2.

Under the Agreement, Intellibed agreed "not to directly or indirectly contact or initiate contact with [Mattress Firm] or any officers, directors, shareholders, consultants, attorneys, employees, agents or other affiliates of [Mattress Firm] at any time or for any purpose, unless such approval is specifically granted in writing by [London Luxury]." ECF No. 14-2 at 1. Intellibed also agreed that it would notify London Luxury "within 24 hours" in the event that it was contacted by Mattress Firm. ECF No. 14-2 at 1. If Intellibed entered into a business relationship with Mattress Firm within a set amount of time, Intellibed agreed to pay London

---

[1] The Agreement was not attached to Intellibed's complaint, but it is attached as Exhibit A to London Luxury's Motion to Dismiss Plaintiff's Complaint. ECF No. 14-2. The Court considers the actual terms of the Agreement for the purposes of this motion because the Agreement was "incorporated into the complaint by reference." *In re Gold Res. Corp. Sec. Litig.*, 776 F.3d 1103, 1108 (10th Cir. 2015) (quoting *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007)).

Luxury a finder's fee. ECF No. 14-2 at 2. The Agreement contains a merger clause: "This Agreement constitutes the entire agreement between the parties hereto regarding the transactions contemplated herein." ECF No. 14-2 at 2.

On March 13, less than a month after the parties signed the Agreement, Intellibed and London Luxury representatives met with Mattress Firm in Houston, Texas (the "Houston meeting"). Compl. ¶ 25. At the Houston meeting, London Luxury presented mattresses and accessories to Mattress Firm. Compl. ¶ 26. London Luxury presented the Gel Matrix mattress, but it also showed a competing foam mattress in one of the main presentation rooms. Compl. ¶ 26. The Gel Matrix mattress was not featured in the main presentation room. Compl. ¶ 26. London Luxury also used the competing foam mattress as its proposed Columbia-mattress product. Compl. ¶ 26.

Mattress Firm representatives asked London Luxury representatives whether London Luxury had licensing rights from Columbia to market a Columbia-branded mattress. Compl. ¶ 27. London Luxury admitted that it did not have those rights. Compl. ¶ 27. London Luxury had not told Intellibed that it did not have the rights to license a Columbia-branded mattress, and London Luxury did not tell Intellibed that it discussed this issue with Mattress Firm. Compl. ¶ 28.

Intellibed alleges that at the Houston meeting a London Luxury representative told a Mattress Firm executive that if Mattress Firm did not like the Gel Matrix mattress, Mattress Firm would "never have to talk to Intellibed again." Compl. ¶ 29. Intellibed also alleges that London Luxury invited Mattress Firm to visit the manufacturing facilities of the company that produced the competing foam mattress days after the Houston meeting. Compl. ¶ 30. London Luxury never invited Mattress Firm to tour the Intellibed facilities, according to Intellibed. Compl. ¶ 31.

Intellibed alleges that London Luxury made a number of false representations about its business. Specifically, Intellibed has learned or on information and belief maintains:

a) London Luxury's annual revenues are significantly lower than the high hundreds of millions;

b) London Luxury is not only not the largest single accessory provider to London Luxury, it is not even one of the top three accessory providers;

c) London Luxury does not have a strong relationship with the key decision-makers and buyers at Mattress Firm and was not uniquely or specifically situated to affect Mattress Firm's purchasing decisions;

d) London Luxury does not have licensing rights to market Columbia-branded mattresses; and

e) London Luxury did not have a meeting set with Mattress Firm's CEO for February 20.

Compl. ¶ 32. Intellibed alleges that its affiliation with London Luxury was detrimental to its ability to market the Gel Matrix mattress to Mattress Firm. Compl. ¶ 33.

In March 2017, sometime after the Houston meeting, a Mattress Firm representative advised Intellibed not to attend a second meeting that was scheduled between London Luxury and Mattress Firm. Compl. ¶ 34. When Intellibed asked why, the Mattress Firm representative told Intellibed that London Luxury had a negative impact on Intellibed's ability to negotiate with Mattress Firm. Compl. ¶ 34.

Intellibed alleges that London Luxury has done little if anything to market the Gel Matrix mattress since the Houston meeting. Compl. ¶ 35. Intellibed also learned that Mattress Firm entered into a pilot agreement with Purple, a direct competitor of Intellibed, to sell Purple's

competing gel mattress. Compl. ¶ 36. The deal "could be worth millions of dollars." Compl. ¶ 36. Intellibed believes that it lost the ability to secure a comparable deal because of London Luxury's poor relationship with Mattress Firm. Compl. ¶ 36.

Intellibed alleges that London Luxury knowingly made certain false representations during its initial meeting with Intellibed. Compl. ¶ 37. London Luxury allegedly made these representations to get Intellibed to sign the Agreement. Compl. ¶ 37. If London Luxury had not made those representations, Intellibed would not have signed the Agreement and it would be in a better position to market the Gel Matrix mattress. Compl. ¶ 38. Intellibed also alleges that it "performed its obligations under the Agreement." Compl. ¶ 51.

On June 1, 2017, Intellibed filed a complaint against London Luxury. The complaint states four causes of action: (1) fraud/fraud in the inducement, (2) breach of contract (in the alternative), (3) breach of the covenant of good faith and fair dealing (in the alternative), and (4) breach of fiduciary duty. Compl. ¶¶ 40-62. Intellibed asks the Court to rescind the Agreement based on the alleged misrepresentations or, in the alternative, to award damages in excess of $75,000. Compl. at 15-16. London Luxury has moved to dismiss the complaint.

## III. DISCUSSION

### A. WHETHER SUBJECT MATTER JURISDICTION EXISTS

London Luxury contends that the Court lacks subject matter jurisdiction over this case because the $75,000 amount-in-controversy requirement is not satisfied. *See* 28 U.S.C. § 1332(a). Specifically, London Luxury argues that Intellibed's damages are too speculative to satisfy the amount-in-controversy requirement and that Intellibed's rescission claim is essentially worthless in determining whether the amount-in-controversy requirement has been satisfied. London Luxury misunderstands the amount-in-controversy requirement.

When federal subject matter jurisdiction is challenged based on the amount in controversy, the plaintiff must show "that is does not appear to a legal certainty" that he or she cannot recover the jurisdictional amount. *Woodmen of World Life Ins. Soc'y v. Manganaro*, 342 F.3d 1213, 1216 (10th Cir. 2003) (quoting *Watson v. Blankinship*, 20 F.3d 383, 386 (10th Cir. 1994)). Put simply, unless it is *legally certain* that less than $75,000 is at issue, the jurisdictional challenge fails. *See id.*

"The legal certainty standard is very strict." *Id.* As such, "it is difficult for a dismissal to be premised on the basis that the requisite jurisdictional amount is not satisfied." *Id.* "There is a strong presumption favoring the amount alleged by the plaintiff." *Id.* "Generally, dismissal under the legal certainty standard will be warranted only when a contract limits the possible recovery, when the law limits the amount recoverable, or when there is an obvious abuse of federal court jurisdiction." *Id.* at 1217.

In actions seeking declaratory or injunctive relief, "the amount in controversy is measured by the value of the object of the litigation." *Hunt v. Wash. St. Apple Adver. Comm'n*, 432 U.S. 333, 347 (1977). Accordingly, "in cases where a plaintiff seeks to rescind a contract, *the contract's entire value, without offset, is the amount in controversy*." *Rosen v. Chrysler Corp.*, 205 F.3d 918, 921 (6th Cir. 2000) (emphasis added); *see also Pyskaty v. Wide World of Cars, LLC*, 856 F.3d 216, 224 (2d Cir. 2017) (holding that plaintiff's "rescission claim supplies a sufficient basis for subject-matter jurisdiction," despite the fact that her claimed damages "fell well below" the amount-in-controversy requirement).

Here, the amount-in-controversy requirement is satisfied. The Court need only look to the fraud claim to reach this conclusion. Intellibed seeks to rescind the Agreement, so the Court looks to the value of Agreement to determine the amount in controversy. The exact value of the

Agreement is uncertain because the finder's fee turns on prospective sales. The parties could make millions, or nothing. Regardless, the Court cannot conclude that it is a "legal certainty" that the value of the Agreement is less than $75,000. Thus, the amount-in-controversy requirement is satisfied and the Court has subject matter jurisdiction.

## B. MOTION STANDARD

Under Federal Rule of Civil Procedure 12(b)(6), a defendant may move to dismiss a claim upon which relief cannot be granted. The court's function on a Rule 12(b)(6) motion is not to weigh potential evidence that the parties may present at trial but to "assess whether the plaintiff's complaint alone is legally sufficient to state a claim for which relief may be granted." *Dubbs v. Head Start, Inc.*, 336 F.3d 1194, 1201 (10th Cir. 2003) (quoting *Sutton v. Utah State Sch. for the Deaf & Blind*, 173 F.3d 1226, 1236 (10th Cir. 1999)).

"A court reviewing the sufficiency of a complaint presumes all of plaintiff's factual allegations are true and construes them in the light most favorable to the plaintiff." *Hall v. Bellmon*, 935 F.2d 1106, 1109 (10th Cir. 1991). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Plausibility, in the context of a motion to dismiss, means that the plaintiff has alleged facts that allow "the court to draw [a] reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

## C. CHOICE OF LAW ANALYSIS

The Court first turns to the question of which state's law applies to the claims at issue. In making choice of law determinations, a federal court sitting in diversity must apply the choice-of-law provisions of the forum state in which the court sits. *Klaxon v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941). Consequently, Utah's choice-of-law provisions apply.

Under Utah law, "questions involving the extent of contractual obligations are determined by the law chosen by the parties if they have made an effective choice." *Am. Nat'l Fire Ins. Co. v. Farmers Ins. Exch.*, 927 P.2d 186, 188 (Utah 1996) (quoting Restatement (Second) of Conflict of Laws § 205 cmt. b).

Here, the claims for breach of contract and breach of the implied covenant of good faith and fair dealing are governed by New York law. The Agreement provides that it "shall be governed by and construed in accordance with the internal laws of the State of New York." ECF No. 14-2 at 2. Thus, assuming that the Agreement is valid, the parties selected New York law to govern their contractual relationship. Accordingly, the claims for breach of contract and breach of the implied covenant are governed by New York law.

The breach of fiduciary duty claim is also governed by New York law because it is based almost entirely on the relationship created by the Agreement. Intellibed argues that the existence of a fiduciary relationship "is demonstrated by (though not limited to) the terms of the Agreement itself." Thus, assuming that the parties created a fiduciary relationship pursuant to the Agreement, New York law should govern that relationship. Consequently, the Court holds that New York law governs the breach of fiduciary duty claim.

When a party's claim sounds in tort, Utah courts apply "the 'most significant relationship' approach as described in the Restatement (Second) of Conflict of Laws in determining which state's laws should apply to the given circumstances." *Waddoups v. Amalgamated Sugar Co.*, 54 P.3d 1054, 1059 (Utah 2002). For fraud claims, the following factors, among others, are considered: (1) the place where the plaintiff received the representations; (2) the place where the defendant made the representations; and (3) the domicile,

residence, nationality, place of incorporation, and place of business of the parties. Restatement (Second) of Conflict of Laws § 148(2).

Here, the fraud claim is also governed by New York law. Intellibed is Utah corporation, and London Luxury is a New York limited liability company. The negotiations leading up to the Agreement took place at London Luxury's headquarters, presumably in New York. London Luxury made the alleged misrepresentations during these negotiations. Because it appears that New York has the most significant relationship to the fraud claim, the Court concludes that New York law governs that claim as well.

In summary, the Court concludes that New York law governs the claims at issue. Moreover, the parties appear to agree that New York law should govern. Both parties rely almost exclusively on New York law in their briefing, and neither argues that another state's law should apply. Accordingly, the Court applies New York law. *See Cornaby's LLC v. Carnet, LLC*, No. 2:14-cv-00462-JNP, 2017 WL 3503669, at *13 n.7 (D. Utah Aug. 15, 2017) (applying Utah law because movant cited only Utah law in its motion and non-movant did not challenge the application of Utah law).

### D. WHETHER INTELLIBED HAS ALLEGED FRAUD IN THE INDUCEMENT

Under New York law, the elements of a cause of action for fraud are (1) a material misrepresentation of fact by the defendant, (2) knowledge of its falsity, (3) an intent to induce reliance, (4) justifiable reliance by the plaintiff, and (5) injury. *Eurycleia Partners, LP v. Seward & Kissel, LLP*, 910 N.E.2d 976, 979 (N.Y. 2009).

#### 1. Whether London Luxury Made Material Misrepresentations of Fact

Intellibed points to the following alleged misrepresentations to support its fraud in the inducement claim:

a) London Luxury's annual revenues were in the high nine figures, not quite a billion;

b) Approximately one quarter of London Luxury's annual revenues stemmed from work with Mattress Firm;

c) London Luxury was the largest single accessory provider to Mattress Firm;

d) London Luxury had a meeting set with Mattress Firm's CEO on February 20;

e) London Luxury was a major influencer with Mattress Firm, and it had the best relationships of any potential partner with the highest and most senior people and key decision-makers at Mattress Firm; and

f) London Luxury purported that it had a license to market Columbia-branded mattresses.

London Luxury contends that these representations are not actionable because they were mere "puff." London Luxury also argues in a conclusory fashion the representations were immaterial.

Under New York law, false representations of fact are distinguished from puffery and opinion. *See Stern v. Satra Corp.*, 539 F.2d 1305, 1308 (2d Cir. 1976). "Statements that things are 'good,' 'valuable,' 'large,' or 'strong,' necessarily involve an exercise of individual judgment, and even though made absolutely[,] the hearer must know this . . . ." *Id.* (quoting Restatement (First) of Contracts § 474 cmt. c). As such, statements of opinion "do not provide a basis for rescission unless made in bad faith." *Id.*

While generalized statements usually constitute un-actionable puffery, statements that are tied "to some commonly accepted measure" do not. *Id.* Puffery has been defined as "an exaggeration or overstatement expressed in broad, vague, and commendatory language." *Verizon Directories Corp. v. Yellow Book USA, Inc.*, 309 F. Supp. 2d 401, 405 (E.D.N.Y. 2004) (quoting

*Castrol Inc. v. Pennzoil Co.*, 987 F.2d 939, 945 (3d Cir. 1993)). Put simply, "[p]uffery . . . 'cannot be proven either true of false.'" *Id.* (citation omitted).

A false statement of fact must be material to support a fraud claim. *Moore v. PainWebber, Inc.*, 189 F.3d 165, 170 (2d Cir. 1999). "A misrepresentation is material to a fraud claim only if it is the type of misrepresentation likely to be deemed significant to a reasonable person considering whether to enter a transaction." *Id.* "Materiality is usually a question of fact for the jury," but "where the evidence concerning materiality is clear and substantially uncontradicted, the matter is one of law for the court to determine." *Berger v. Manhattan Life Ins. Co.*, 805 F. Supp. 1097, 1102 (S.D.N.Y. 1992) (citation omitted).

While some of the alleged misrepresentations in the case at hand may constitute puffery,[2] others do not. For instance, the following can be proven false: (1) London Luxury's annual revenues were in the high nine figures, (2) one quarter of its annual revenue came from work with Mattress Firm, and (3) it was the largest single accessory provider to Mattress Firm. These are not statements of opinion nor are they mere puff. *See, e.g.*, *Castrol Inc.*, 987 F.2d at 946 (Penzoil's claim that its products "outperform" competitors' products was not puffery because it was "specific and measurable").

These statements also appear to be material. Intellibed told London Luxury that it was looking for a partner to market the Gel Matrix mattress to Mattress Firm. And Intellibed asked London Luxury detailed questions about its relationship with Mattress Firm. Thus, statements of

---

[2] For instance, London Luxury's claim that it was a "major influencer" of Mattress Firm reflects London Luxury's *estimate* of its ability to influence Mattress Firm. There is no way to objectively measure London Luxury's influence over Mattress Firm. These types of statements are routinely held to be un-actionable unless there is evidence of bad faith. *See, e.g.*, *Stern*, 539 F.2d at 1308 ("[Plaintiff's] estimates of his influence with IBM, his ability to make the deal for [Defendant], and the necessity of his retention to acquire IBM as a customer in our view fall into the category of an individual judgment or opinion which would not provide a basis for rescission unless made in bad faith . . . .").

fact regarding London Luxury's business dealing with Mattress Firm were statements that London Luxury knew (or should have known) were likely to influence Intellibed's decision-making process. Accordingly, the Court holds that the allegations plausibly establish that London Luxury made false statements of material fact.

### 2. Whether Intellibed Alleged Falsity With the Required Particularity

London Luxury also argues that Intellibed has failed to allege the falsity of the representations with the requisite particularity. Specifically, London Luxury contends that allegations based "on information and belief" are insufficient to support Intellibed's fraud claim. London Luxury also attacks Intellibed's decision to not identify the "Mattress Firm representative" who informed Intellibed that many of London Luxury's representations were false. The Court is not persuaded by London Luxury's arguments.

Claims of fraud must satisfy the pleading requirements of Rule 9(b), which requires that allegations of fraud "state with particularity the circumstances constituting fraud." A complaint alleging fraud must set forth the "time, place and contents of the false representation, the identity of the party making the false statements and the consequences thereof." *Koch v. Koch Indus., Inc.*, 203 F.3d 1202, 1236 (10th Cir. 2000) (citation omitted). This rule gives defendants "fair notice of the plaintiff's claim and the factual ground upon which it is based" and "safeguards [a] defendant's reputation and goodwill from improvident charges of wrongdoing." *Farlow v. Peat, Marwick, Mitchell & Co.*, 956 F.2d 982, 987 (10th Cir. 1992) (quoting *Ross v. Bolton*, 904 F.2d 819, 823 (2d Cir. 1990)).

Here, Intellibed has satisfied the requirements of Rule 9(b). Intellibed identifies London Luxury's CEO Marc Jason and its president Mr. Schwartz as the persons who made the false statements. And Intellibed alleges that the false statements were made at the initial meeting between the parties on February 13 at London Luxury's headquarters. There is no requirement

that Intellibed identify the Mattress Firm representative who later told Intellibed that the statements were false.[3] Moreover, the veracity of the information Intellibed received—along with information about the size of London Luxury's annual revenues and its business with Mattress Firm—is information that, in large part, is uniquely in the possession of London Luxury. *See George v. Urban Settlement Servs.*, 833 F.3d 1242, 1255 (10th Cir. 2016) ("[I]n determining whether a plaintiff has satisfied Rule 9(b), courts may consider whether any pleading deficiencies resulted from the plaintiff's inability to obtain information in the defendant's exclusive control."); *Koch*, 203 F.3d at 1237 ("[A]llegations of fraud may be based on information and belief when the facts in question are peculiarly within the opposing party's knowledge and the complaint sets forth the factual basis for the plaintiff's belief."). Thus, the Court concludes that Intellibed has alleged falsity with the requisite particularity.

### 3. Whether Intellibed Has Alleged Injury With the Required Particularity

London Luxury next argues that Intellibed has failed to allege the consequences of the misrepresentations. But Intellibed alleges that it "relied on each of [London Luxury's] representations" when it "decided to enter into the Agreement." This describes the consequences of the alleged misrepresentations—Intellibed signed the Agreement. Because Intellibed seeks rescission, it need only plead detrimental reliance, not monetary damages. *See Phone Card Am., Inc. v. Quality Disc. Equip. Sellers, LLC*, No. 21832/09, 2010 WL 1576833, at *3 (N.Y. Sup. Ct.

---

[3] London Luxury cites *Koch* for the proposition that "'information and belief' allegations can support a fraud claim only under very limited circumstances, ordinarily only when alleging intent." But London Luxury ignores the context of the *Koch* court's discussion of "information and belief allegations," which was made in connection with the requirement that the allegations set forth the "time, place and contents of the false representations, *the identity of the party making the false statement* and the consequences thereof." *Koch*, 203 F.3d at 1236 (emphasis added). The *Koch* court did not address the specificity with which a plaintiff must identify the source from which it learns that representations were false. *See id.* at 1236-37. The names of potential witnesses and sources of information are, in the Court's view, matters for discovery.

Apr. 20, 2010) ("Where there has been fraud in the inducement of a contract, rescission can be a proper remedy."). Accordingly, the Court holds that Intellibed has adequately alleged injury.[4]

### 4. Intellibed Has Stated a Claim for Fraud/Fraud in the Inducement

For the reasons set forth above, the Court concludes that Intellibed has adequately alleged a claim for fraud/fraud in the inducement. Accordingly, the Court denies London Luxury's request that the Court dismiss Intellibed's fraud/fraud in the inducement claim.

### E. WHETHER INTELLIBED HAS STATED A BREACH OF CONTRACT CLAIM

To state a claim for breach of contract under New York law, a plaintiff must adequately allege the following: "(1) the existence of an agreement, (2) adequate performance of the contract by the plaintiff, (3) breach of the contract by the defendant, and (4) damages." *Harsco Corp. v. Segui*, 91 F.3d 337, 348 (2d Cir. 1996). London Luxury claims that Intellibed has failed to allege performance, breach, and damages.

### 1. Whether Intellibed Alleged That It Adequately Performed

London Luxury argues that Intellibed failed to allege that it adequately performed. In fact, London Luxury contends that Intellibed's allegations demonstrate that *Intellibed* breached the Agreement by speaking with Mattress Firm representatives. Specifically, London Luxury

---

[4] Intellibed has, however, failed to plead out-of-pocket damages with the requisite particularity. For a fraud claim, "[t]he true measure of damages is indemnity for the actual pecuniary loss sustained as a direct result of the wrong or what is known as the out-of-pocket rule." *Connaughton v. Chipotle Mexican Grill, Inc.*, 75 N.E.3d 1159, 1163 (N.Y. 2017) (internal quotation marks omitted) (quoting *Lama Holding Co. v. Smith Barney Inc.*, 668 N.E.2d 1370, 1373 (N.Y. 1996)). Under that rule, "[t]he recovery for consequential damages naturally flowing from a fraud is limited to that which is necessary to restore a party to the position occupied before commission of the fraud." *Lama Holding*, 668 N.E.2d at 1374 (citation omitted). Here, while not fatal to the fraud claim, Intellibed does not allege any compensable damages resulting from the alleged fraud. Intellibed merely claims that it "has been damaged in an amount to be determined at trial." To the extent that Intellibed wishes to recover out-of-pocket expenses, it has fourteen days from the date of this Order to amend its complaint to allege them. Otherwise, it will be barred from pursuing them.

points to allegations concerning a conversation between Intellibed and Mattress Firm representatives that occurred sometime in March 2017. Intellibed responds that it has alleged adequate performance, at least up until the point when London Luxury allegedly breached the "best efforts" clause. In support of this, Intellibed points to paragraph 51 of its complaint that provides, "Intellibed has performed its obligations under the Agreement."

Under New York law, a plaintiff's "failure to plead the performance of its own contractual obligations is fatal to a breach of contract claim even if the other requisite elements are properly pleaded." *Comfort Inn Oceanside v. Hertz Corp.*, No. 11-cv-1534, 2011 WL 5238658, at *3 (E.D.N.Y. Nov. 1, 2011); *see also Landmark Ventures, Inc. v. Wave Sys. Corp.*, 513 Fed. App'x 109, 111-12 (2d Cir. 2013).

Here, Intellibed has alleged adequate performance because the allegations plausibly establish that Intellibed did not contact Mattress Firm before the alleged breach. Intellibed claims that London Luxury breached the "best efforts" clause when, among other things, London Luxury told Mattress Firm that it would never have to talk to Intellibed again if it did not like the Gel Matrix mattress. This allegedly occurred at the Houston meeting. The only relevant duty imposed on Intellibed up to that point was "not to directly or indirectly contact or initiate contact" with anyone from Mattress Firm. And the allegations plausibly establish that Intellibed did not "contact" Mattress Firm before or during the Houston meeting.[5] Intellibed's other duty—

---

[5] London Luxury insists that the allegation that "Intellibed has performed its obligations under the Agreement" is insufficient to allege adequate performance. In support of this argument, London Luxury cites *Landmark Ventures*, in which the Second Circuit held that the plaintiff failed to allege adequate performance because it "fail[ed] to identify any service it performed for which it was not paid." 513 Fed. App'x at 111. Instead of identifying the services for which it had not been paid, the plaintiff merely alleged that it had "duly performed [its] obligations . . . under the Agreement." *Id.* But *Landmark Ventures* is fundamentally different from the case at hand because the breach of contract claim in *Landmark Ventures* depended on the specific services performed by the plaintiff. Here, unlike in *Landmark Ventures*, London Luxury's

to pay a finder's fee—would only arise if it entered into a deal with Mattress Firm. Thus, the Court concludes that Intellibed has alleged that it adequately performed.[6]

## 2. Whether Intellibed Alleged That London Luxury Breached the "Best Efforts" Clause

London Luxury argues that Intellibed has failed to adequately allege breach of the "best efforts" clause. Specifically, London Luxury contends that the allegations show that it used "best efforts" to market the Gel Matrix mattress by securing meetings with Mattress Firm weeks after the parties signed the Agreement. Intellibed disputes this, pointing to the allegations that London Luxury gave up on marketing the Gel Matrix mattress and that London Luxury told Mattress Firm that it would not have to talk to Intellibed if it did not like the Gel Matrix mattress. The Court agrees with Intellibed.

Under New York law, a best efforts clause imposes "'an obligation to act with good faith in light of one's own capabilities,' and [to] apply 'such efforts as are reasonable in light of that party's ability and the means at its disposal and of the other party's justifiable expectations.'" *Bd. of Managers of Choco. Factory Condo. ex rel. Choco. Factory Condo. v. Choco. Partners, LLC*, No. 26667/2011, 2014 WL 1910237, at *7 (N.Y. Sup. Ct. May 13, 2014) (quoting *Ashokan Water Servs., Inc. v. New Start, LLC*, 807 N.Y.S.2d 550, 555 (N.Y. Civ. Ct. 2006)). "Best efforts

_____

performance was not conditioned on any initial performance by Intellibed: London Luxury was required to use "best efforts" to market the Gel Matrix mattress to Mattress Firm while Intellibed refrained from contacting Mattress Firm. As such, *Landmark Ventures* provides little guidance in the case at hand.

[6] Intellibed alleges that *it was contacted* by a Mattress Firm representative at some point after the Houston meeting. But it is not clear from the face of the complaint that this constitutes a breach. And in any event, the conversation occurred *after* London Luxury is alleged to have breached the "best efforts" clause. While Intellibed would have breached the Agreement if it did not notify London Luxury within twenty-four hours of the contact, the complaint is silent on whether Intellibed gave such notice. For purposes of this motion, the Court must limit its analysis to the allegations in the complaint. And nothing in the complaint conclusively establishes that Intellibed breached the Agreement.

requires greater care and diligence than the ordinary care and diligence to which the promisor would otherwise be bound to exercise." *Ashokan*, 807 N.Y.S.2d at 555 (internal quotation marks omitted). As such, "a promisor may be found to have breached a duty to use 'best efforts,' even if it had not breached the implied duty of 'fair dealing.'" *Id.*

A contract need not define "best efforts" for the provision to be enforceable. *U.S. Airways Grp., Inc. v. British Airways PLC*, 989 F. Supp. 482, 491 (S.D.N.Y. 1997) (citing *Bloor v. Falstaff Brewing Corp.*, 454 F. Supp. 258, 266-67 (S.D.N.Y. 1978)). But to the extent that the term "best efforts" is ambiguous, "extrinsic circumstances concerning the parties' understanding of that term may be considered by the finder of fact." *Id.* at 491.[7]

Here, Intellibed's allegations plausibly establish that London Luxury breached the "best efforts" clause. London Luxury was required to use "best efforts" to market the Gel Matrix mattress to Mattress Firm. At the least, London Luxury was required to act in good faith and to use efforts that were reasonable in light of Intellibed's expectations. Intellibed allegedly believed that London Luxury had a strong relationship with key decision-makers at Mattress Firm. Intellibed claims that a London Luxury representative told a Mattress Firm representative that "if Mattress Firm did not like the Gel Matrix mattress, Mattress Firm would never have to talk to Intellibed again." London Luxury allegedly made this statement when it first showed Mattress

---

[7] Both parties offer dramatically different interpretations of the "best efforts" clause. The term is ambiguous as it is used in the Agreement, and thus the parties can offer extrinsic evidence concerning what they understood "best efforts" to mean. *U.S. Airways*, 989 F. Supp. at 491. As such, statements by London Luxury (*e.g.*, that it was "major influencer with Mattress Firm") could be used to show how Intellibed understood "best efforts." Of course, Intellibed would have understood "best efforts" differently if London Luxury said that it had no pre-existing relationship with Mattress Firm. And representations London Luxury made regarding a potential Columbia-branded line of Intellibed products could shed light on how Intellibed understood "best efforts." But the "best efforts" clause cannot be used to impose an obligation (*e.g.*, to market a Columbia-branded Intellibed mattress) on London Luxury when such a requirement is absent from the Agreement.

Firm the Gel Matrix mattress, less than a month after the parties signed the Agreement. Such a statement, depending on the context, suggests that London Luxury failed to use "best efforts" to market the Gel Matrix mattress, thereby breaching the Agreement.

To further support the breach of contract claim, Intellibed points to the allegation that since the Houston meeting "London Luxury has done little if anything to market" the Gel Matrix mattress. Somewhat confusingly, Intellibed also alleges that it was told by a Mattress Firm representative "not to attend a second meeting that was scheduled between London Luxury and Mattress Firm." This may suggest that Intellibed stopped cooperating with London Luxury. But Intellibed has artfully avoided alleging that it breached the Agreement, *see supra* note 6, so the allegation that London Luxury stopped promoting the Gel Matrix mattress also suggests that London Luxury breached the "best efforts" clause.

Intellibed also argues that London Luxury failed to use "best efforts" because it showed a competing foam mattress in the main presentation room (while the Gel Matrix mattress was relegated to a less prominent room). The Court is skeptical that this constitutes a breach of the "best efforts" clause. Under the Agreement, London Luxury was prohibited from marketing any other "gel matrix" mattress to Mattress Firm. But the Agreement does not speak to foam mattresses. Admittedly, London Luxury may have run afoul of the "best efforts" clause if it promoted other mattresses in a way that was extremely detrimental to Intellibed. But the simple fact that London Luxury did not put the Gel Matrix mattress front and center (at the first meeting Intellibed attended) does not constitute a breach of the "best efforts" clause. Indeed, Intellibed seems to suggest that London Luxury was required to feature the Gel Matrix mattress in the main showroom at every meeting with Mattress Firm, but this is not what the Agreement required.

The Court is also skeptical of Intellibed's argument that London Luxury breached the "best efforts" clause by not marketing the Gel Matrix mattress as part of a proposed Columbia-branded product line. The Agreement makes no mention of marketing the Gel Matrix mattress as part of a Columbia-branded line. If Intellibed wanted such a term, it could have negotiated for it. Intellibed's argument is also weakened by the fact that the Houston meeting occurred weeks after the parties signed the Agreement, giving London Luxury a short amount of time to incorporate the Gel Matrix mattress into a Columbia-branded line. Nevertheless, London Luxury's decision to promote another mattress as part of a Columbia-branded line of products may constitute some evidence that London Luxury did not use "best efforts" to market the Gel Matrix mattress.

Likewise, the Court is not convinced by Intellibed's argument that London Luxury breached the best efforts clause by "misrepresenting its capabilities and influence with Mattress Firm in inducing Intellibed into the Agreement." This argument is illogical. The Court is not aware of any case, and Intellibed cites none, in which a party's actions prior to contract formation constitute a breach of contract. London Luxury was required to use "best efforts" only *after it executed the Agreement*. Anything it did prior to that point could not constitute a breach of the "best efforts" clause.

In summary, the Court holds that Intellibed has adequately alleged that London Luxury breached the "best efforts" clause. Specifically, allegations that London Luxury told Mattress Firm that it would never have to talk to Intellibed again if Mattress Firm didn't like the Gel Matrix strongly suggest that London Luxury failed to use "best efforts."

### 3. Whether Intellibed Has Sufficiently Alleged Damages

London Luxury argues that Intellibed has failed to adequately allege damages because its alleged lost profits are too speculative. Intellibed argues that it has sufficiently pleaded lost

profits, pointing to allegations concerning an agreement that Mattress Firm entered into with Purple, another mattress company.

To recover lost profits, a plaintiff must show that the alleged loss is capable of proof with reasonable certainty and that the damages were fairly within contemplation of the parties. *Kenford Co., Inc. v. Erie Cty.*, 493 N.E.2d 234, 235 (N.Y. 1986). Courts applying New York law will dismiss lost profit claims at the pleading stage if "the pleadings suggest that an award of lost profits would require an unreasonable level of speculation." *Robin Bay Assocs. v. Merrill Lynch & Co.*, No. 07 Civ. 376(JMB), 2008 WL 2275902, at *7 (S.D.N.Y. June 3, 2008) (citing *Calip Dairies, Inc. v. Penn Station News Corp.*, 695 N.Y.S.2d 70, 71 (N.Y. App. Div. 1999)).

Here, Intellibed has sufficiently alleged that its lost profits are capable of proof with reasonable certainty. The chain of events leading to the lost profits is not nearly as speculative as London Luxury claims: London Luxury was required to use "best efforts" to market the Gel Matrix mattress to Mattress Firm; London Luxury allegedly failed to do so by, among other things, telling Mattress Firm that it would never have to talk to Intellibed again if it did not like the Gel Matrix mattress; as a result, Intellibed lost the opportunity to do a deal with Mattress Firm; Mattress Firm did a deal with Purple, one of Intellibed's direct competitors.

The amount of lost profits, if any, can be properly estimated under these circumstances. Intellibed already sells mattresses in the marketplace; it is not a "new business." Shortly after the Houston meeting, Mattress Firm allegedly entered into a pilot agreement with Purple. The parties will presumably be able to discover whether Mattress Firm wanted to enter into a similar agreement with Intellibed.[8] This information, in conjunction with Intellibed's own operational information and other market data, could then be used by an expert to calculate Intellibed's lost

---

[8] Indeed, Intellibed's allegations suggest that Mattress Firm would have entered into an agreement with Intellibed *but for* Intellibed's relationship with London Luxury.

profits. Accordingly, the Court holds that Intellibed has adequately alleged a claim for lost profits at the pleading stage. *See Coniber v. Ctr. Point Transfer Station, Inc.*, 27 N.Y.S.3d 763, 767 (N.Y. App. Div. 2016) (holding that there was an adequate basis for calculating profits because plaintiff's business was not new and it had sales and cost data that could be used to "estimate lost profit"); *Wakeman v. Wheeler & Wilson Mfg. Co.*, 4 N.E. 264, 266 (N.Y. 1886) ("A person violating his contract should not be permitted entirely to escape liability because the amount of the damage which he has caused is uncertain.").

### 4. Intellibed Has Stated a Breach of Contract Claim

For the reasons set forth above, the Court concludes that Intellibed has adequately alleged a claim for breach of contract. Accordingly, the Court denies London Luxury's request that the Court dismiss the breach of contract claim.

### F. WHETHER INTELLIBED HAS ALLEGED THAT LONDON LUXURY BREACHED THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

London Luxury argues that Intellibed's claim for breach of the implied covenant of good faith and fair dealing is insufficient as a matter of law. Intellibed contends that it has alleged sufficient facts, pointing to allegations that London Luxury pursued its own interests to the detriment of Intellibed, marketed competing products to Mattress Firm, and fostered relationships between Mattress Firm and competing mattress manufacturers to the detriment of Intellibed.

Specifically, Intellibed points to the following allegations to support its breach of the implied covenant of good faith and fair dealing claim:

      a) On March 13, 2017, at a meeting Houston, Texas, London Luxury showed a competing mattress in its main showroom (while relegating the Gel Matrix

mattress to a different room), and gave the competing mattress the spot in the
Columbia product line it promised to Intellibed;

b) At the same meeting, London Luxury stated to Mattress Firm that, if it did not
like the Gel Matrix mattress, Mattress Firm would never have to talk to Intellibed
again; and

c) In the week after the meeting, London Luxury invited Mattress Firm to visit the
manufacturing facilities for the competing foam mattress in which London
Luxury had a pecuniary interest and never sought to do the same for Intellibed's
mattress.

New York law imposes a duty of good faith and fair dealing in all contracts. *See Van
Valkenberg, Nooger & Neville, Inc. v. Hayden Publ'g Co.*, 281 N.E.2d 142, 145 (N.Y. 1972). It
requires the parties to not do anything that "will have the effect of destroying or injuring the
rights of the other party to receive the fruits of the contract." *511 W. 232nd Owners Corp. v.
Jennifer Realty Co.*, 773 N.E.2d 496, 500 (N.Y. 2002) (citation omitted). But the duty of good
faith and fair dealing cannot be used to imply obligations that are "inconsistent with other terms
of the contractual relationship." *Murphy v. Am. Home Prods. Corp.*, 448 N.E.2d 86, 91 (N.Y.
1983).

Here, Intellibed has adequately alleged that London Luxury breached the implied
covenant of good faith and fair dealing. As discussed above, Intellibed alleges that London
Luxury told Mattress Firm that it would never have to talk to Intellibed again if it did not like the
Gel Matrix mattress. Such a statement, depending on the context, may be evidence that London
Luxury acted in bad faith, harming Intellibed's chances of entering into a business relationship
with Mattress Firm. This allegation is sufficient to state a claim for breach of the implied

covenant. Accordingly, the Court holds that Intellibed has adequately alleged that London Luxury breached the implied covenant of good faith and fair dealing.

The Court is less convinced that promoting a foam mattress, which the Agreement did not expressly forbid, is evidence that London Luxury acted in bad faith. As the Court of Appeals explained in *Valkenberg*:

> It has already been observed that in this contract there was an undertaking by the publisher to use its "best efforts" to promote the author's works. Such a contract does not close off the right of a publisher to issue books on the same subject, to negotiate with and pay authors to write such books and to promote them fully according to the publisher's economic interests, *even though those later publications adversely affect the contracting author's sales*.

281 N.E.2d at 144 (emphasis added). While the world of mattress sales may differ from publishing, similar principles apply. Simply promoting a foam mattress (which the Agreement allowed) does little to suggest that London Luxury acted in bad faith, even if these actions may have adversely impacted Intellibed. If Intellibed truly sought to prevent London Luxury from marketing foam mattresses to Mattress Firm, it should have included that restriction in the Agreement. Indeed, Intellibed negotiated for a term that prevented London Luxury from marketing other "gel matrix" mattresses, suggesting that Intellibed should have known that London Luxury would market non-gel-matrix mattresses to Mattress Firm.

## G. WHETHER INTELLIBED HAS ALLEGED A CLAIM FOR BREACH OF FIDUCIARY DUTY

The elements for a breach of fiduciary duty cause of action are (1) proof of a fiduciary relationship and duty, (2) breach of that duty, and (3) damages directly caused by the defendant's breach. *Deblinger v. Sani-Pine Prods. Co., Inc.*, 967 N.Y.S.2d 394, 396 (N.Y. App. Div. 2013). London Luxury contends that there was no fiduciary relationship.

### 1. Intellibed's Breach of Fiduciary Duty Claim is Duplicative of Its Breach of Contract Claim

In New York, "[a] cause of action for breach of fiduciary duty which is merely duplicative of a breach of contract claim cannot stand." *William Kaufman Org., Ltd. v. Graham & James LLP*, 703 N.Y.S.2d 439, 442 (N.Y. App. Div. 2000). Here, the breach of fiduciary duty claim is duplicative of the breach of contract claim. The breach of fiduciary duty claim is based on allegations that London Luxury promoted competitors' products, made statements to Mattress Firm that harmed Intellibed, and stopped promoting the Gel Matrix mattress. These are the same allegations that support the breach of contract claim. *See id.* (dismissal of breach of fiduciary duty claim was proper because "the cause of action for breach of contract refers, at paragraph 60 of the complaint, to the unethical conduct described in paragraph 53 and 54, which constitute the allegations of breach of fiduciary duty"). The breach of fiduciary duty claim is duplicative of the breach of contract claim, and therefore the Court dismisses the breach of fiduciary duty claim with prejudice.[9]

### 2. Intellibed Failed to Allege the Existence of a Fiduciary Relationship

Setting aside the above analysis, Intellibed's claim for breach of fiduciary duty fails for an independent reason: Intellibed has not alleged the existence of a fiduciary relationship. Under New York law, "[a] fiduciary relationship 'exists between two persons when one of them is under a duty to act for or to give advice for the benefit of another upon matters within the scope of the relation.'" *EBC I, Inc. v. Goldman, Sachs & Co.*, 832 N.E.2d 26, 31 (N.Y. 2005) (quoting Restatement (Second) of Torts § 874 cmt. a). A fiduciary relationship is "grounded in a higher level of trust than normally present in the marketplace between those involved in arm's length

---

[9] This conclusion is bolstered by statements made by counsel for Intellibed at oral argument: "Now I've only pled [the breach of fiduciary duty claim] as an alternative claim because I really don't need it if the [breach of contract claim is] successful." Hearing Tr. at 51.

business transactions." *Id.* As such, "an arms-length commercial transaction generally does not give rise to a fiduciary relationship." *PetEdge, Inc. v. Garg*, No. 1:15-cv-9606-GHW, 2017 WL 564088, at *16 (S.D.N.Y. Feb. 10, 2017) (citation omitted).

When parties have entered into a contract, courts should first "look to that agreement 'to discover . . . the nexus of [the parties'] relationship and the particular contractual expression establishing the parties' interdependency.'" *EBC I*, 832 N.E.2d at 31 (quoting *Northeast Gen. Corp. v. Wellington Adv.*, 624 N.E.2d 129, 130 (N.Y. 1993)). To determine whether a contract creates a fiduciary relationship, courts look to "the services agreed to under the contract." *Northeast Gen.*, 624 N.E.2d at 132. "If the parties . . . do not create their own relationship of higher trust, courts should not ordinarily transport them to the higher realm of relationship and fashion the stricter duty for them." *EBC I*, 832 N.E.2d at 31 (citation omitted).

But a fiduciary relationship "is not dependent solely upon an agreement or a contractual relationship between the fiduciary and the beneficiary but results from the relation." *Id.* (quoting Restatement (Second) of Torts § 874 cmt. b). As such, "a cause of action for breach of fiduciary duty may survive, for pleading purposes, where the complaining party sets forth allegations that, *apart from the terms of the contract*," show "a relationship of higher trust." *Id.* (emphasis added). "[A]bsent [a] special agreement or special circumstances, the forces and mores of the marketplace govern . . . ." *Northeast Gen.*, 624 N.E.2d at 130.

A finder's fee agreement does not typically create a fiduciary relationship, especially when the finder does not have the authority to act on the other party's behalf. *See id.* at 132. In *Northeast General*, the parties entered into a finder's fee agreement. *Id.* at 130. After looking at the agreement, the Court of Appeals concluded that there was no fiduciary relationship because, among other reasons, the finder had no "explicit or implied power" to bind the other party; the

finder only had the power to "find and introduce prospects." *Id.* at 132. Accordingly, the "common mores of the marketplace" governed the relationship established by the agreement, which contemplated nothing more than "performance of a simple service," finding prospective buyers. *Id.* at 133.

Here, the Agreement did not create a fiduciary relationship. London Luxury agreed to use "best efforts" to market the Gel Matrix mattress to Mattress Firm. In exchange, Intellibed agreed not to contact Mattress Firm and to pay London Luxury a finder's fee. London Luxury did not have authority to negotiate or enter into contracts on Intellibed's behalf. While the Agreement does prohibit Intellibed from contacting Mattress Firm, Intellibed is free to market the Gel Matrix mattress to anyone but Mattress Firm. There is nothing in the Agreement suggesting that the parties contemplated a fiduciary relationship—"if [Intellibed] wanted fiduciary-like relationships or responsibilities, it could have bargained for and specified them in the contract." *Northeast Gen.*, 624 N.E.2d at 132.[10]

Intellibed contends that it has alleged a relationship of higher trust, citing *EBC I, Inc. v. Goldman, Sachs & Co.* But that case is distinguishable. There, Goldman Sachs entered into an underwriting agreement with a toy company. 832 N.E.2d at 29. The Court of Appeals implicitly determined that the underwriting agreement by itself was insufficient to create a fiduciary relationship. *See id.* at 31. But the toy company alleged "an advisory relationship that was *independent* of the . . . agreement." *Id.* (emphasis added). Specifically, the toy company alleged that it placed trust and confidence in Goldman Sachs to effectuate an initial public offering for

---

[10] During oral argument, counsel for Intellibed argued that a fiduciary relationship exists because the parties did not expressly agree otherwise. But New York law provides to the contrary. Indeed, courts applying New York law "should not attempt to elevate all the mores of society to the standard of the 'punctilio of an honor most sensitive.'" *Northeast Gen.*, 624 N.E.2d at 133 (quoting *Meinhard v. Salmon*, 164 N.E. 545, 546 (N.Y. 1928)).

the toy company, which included Goldman Sachs advising the toy company on a fair price for the toy company's shares. *Id.*

Here, Intellibed fails to allege a separate advisory relationship or agreement. London Luxury is not alleged to have acted as a "trusted advisor"; its main duty was to simply market the Gel Matrix mattress to Mattress Firm. The fact that Intellibed signed the Agreement about a week after its initial meeting with London Luxury also undermines the idea that there was some separate advisory relationship not contemplated in the Agreement. The Agreement even provides: "This Agreement constitutes the entire agreement between the parties hereto regarding the transactions contemplated herein."

Accordingly, the Court holds that Intellibed has failed to allege any facts giving rise to a fiduciary relationship between it and London Luxury. Thus, the breach of fiduciary duty claim should be dismissed with prejudice even if it were not duplicative of the breach of contract claim.

## IV.    CONCLUSION AND ORDER

For the reasons set forth above, Defendant's Motion to Dismiss Plaintiff's Complaint (ECF No. 14) is GRANTED IN PART and DENIED IN PART. Specifically, the Court holds (1) the fraud/fraud in the inducement claim remains, (2) the breach of contract claim remains, (3) the breach of the implied covenant of good faith and fair dealing claim remains, and (4) the breach of fiduciary duty claim is dismissed with prejudice. At its option, Plaintiff has fourteen days from the date of this Order to allege out-of-pocket expenses in connection with its fraud/fraud in the inducement claim.

//

//

//

Signed December 5, 2017

BY THE COURT

Jill N. Parrish
United States District Court Judge